J-S36041-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ANTHONY MARCUS DAVIS, | |
| Appellant | No. 1325 MDA 2015 |

Appeal from the Judgment of Sentence June 25, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0004356-2014

BEFORE:  MUNDY, J., DUBOW, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 06, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Dauphin County after a jury convicted Appellant of Criminal Solicitation—Kidnap to Facilitate a Felony.[1]  Sentenced to a mandatory term of incarceration of not less than 120 months nor more than 240 months[2], which the court ran consecutively to an existing 20 ½ to 41 year sentence Appellant was serving for robbery, aggravated assault, burglary, and multiple counts of kidnapping for ransom, Appellant raises challenges to the weight of the evidence and the imposition of consecutive sentences.  We affirm.

_____

[1] 18 Pa.C.S. § 902(A).
[2] This sentence was mandatory under the second strike provision of the recidivist sentencing statute at 42 Pa.C.S. § 9714(a).


*Former Justice specially assigned to the Superior Court.

The trial court has aptly summarized the pertinent procedural and factual history of Appellant's case as follows:

Appellant, Anthony Marcus Davis, was charged with a single count [of] Criminal Solicitation—Kidnap to Facilitate a Felony. Following a jury trial held on June 8-9, 2015, Appellant was found guilty. On June 25, 2015, sentence was imposed at which [Appellant] was committed to incarceration for a term of not less than 120 months nor more than 240 months set to run consecutively with his sentence at Lancaster County Docket No. CP-36-CR-5282-2005.

Appellant timely filed a post-sentence motion. In his Motion, Appellant requested an arrest of judgment asserting that the verdict was against the weight of the evidence as the Commonwealth had failed to disprove the defense of renunciation beyond a reasonable doubt. He also asked that this Court modify his sentence contending it was excessive and unreasonable in that it had been set to run consecutively with the sentence he was already serving on a Lancaster County docket. Upon review of his motion and the Commonwealth's response, [the trial court] denied his request for relief by order dated July 1, 2015.

On July 31, 2015, Appellant timely filed a Notice of Appeal to the Superior Court. In compliance with this Court's order, he also timely filed his Concise Statement of Matters Complained of on Appeal in accordance with Pa.R.A.P. 1925(b). On appeal, Appellant raises [issues challenging the weight of the evidence and the discretionary aspects of his sentence].

A jury trial held on June 8-9, 2015, established the following facts: At the time of trial, George Zozos ("MDJ Zozos") had been a Magisterial District Justice ("MDJ") in Dauphin County for 34 years. (N.T., Trial 6/8/15 at 34). MDJ Zozos' wife is named Ginger ("Mrs. Zozos"). On or about July 15, 2014, MDJ Zozos became aware of Appellant's plot to kidnap him and his wife by way of a meeting with Detective John Goshert ("Chief Goshert"), Chief of the Dauphin County Criminal Investigation Department ("CID"). (N.T. at 35-38). Based on the threat, MDJ Zozos and his wife were placed under guard by the Harrisburg City Bureau of Police. (N.T. at 36).

The kidnapping came to light when Kenneth Lee Pailen ("Lee" or "Mr. Pailen") gave a July 9, 2014, letter he had received from Appellant to his parole officer and, subsequently, to detectives investigating the case. (N.T. 6/9/15 at 71). Chief Goshert, Detective Sergeant Todd Johnson ("Det. Sgt. Johnson") and Detective Peter Fure ("Det. Fure") proceeded to investigate the plan to kidnap MDJ Zozos outlined in the letter.

Matthew Zeno ("Zeno") met Appellant while they were housed on the same cell block in SCI-Rockview. (N.T. 6/9/15 at 10). The pair began an emotional and sexual relationship that lasted approximately one year until Zeno was released on parole. (N.T. at 10-12). Zeno was paroled on June 14, 2014, at which time he moved to an approved residence at 317 North Sixth Street, in Reading, Pennsylvania. (N.T. at 12-15).

Zeno remained in telephone contact with Appellant after he was released. (N.T. at 13). Later, Zeno received a letter postmarked June 24, 2014, that had a return address reading "Anthony Davis, HM6876, 301 Institution Drive, Bellefonte, PA 16823[, the mailing address for SCI_Benner Township,] and was addressed to Zeno's Reading residence. (N.T. at 16-17). The greeting was addressed to "La" and the closing was signed by "Guy, Guy" which Zeno confirmed were nicknames for himself and Appellant. (N.T. at 18, 22). Upon inspection of the letter, Zeno testified to recognizing the hand writing on the envelope and letter as belonging to Appellant. (N.T. at 17, 22).

The prosecutor had Zeno read the letter aloud for the jury. The beginning of the letter included a thank you for a birthday card sent by Zeno to Appellant and a long recitation of Appellant's expressions of love, appreciation and longing for Zeno. (N.T. at 19-20). The letter went on to indicate that Appellant needed Zeno to do a favor for him, "I really need you to pull off the impossible, which I need—which I know now is possible because I believe in you and trust you more than ever." (N.T. at 20). The favor Appellant had asked for in the letter read as follows:

> I need you to get me out of jail by July 14, 2014. If you love me like you say you do and you're my ride or die soulmate bitch get the ball moving because unless you do this, me – or we won't be together

and can't be together. Actions speak louder than word [sic].

Read carefully. Find one or two people you trust to ride with you on this.
***
Get some gloves, duct tape, rope, taser gun, and everything you think you might need to pull off a kidnapping.

***
Find transportation, someone who can drive. Find a safe location to keep a hostage at for a day or two.

***
Search the computer to find the home addresses of the following people, Harrisburg, Camp Hill, New Cumberland, *et cetera* area. John E. Wetzel, Secretary of Corrections. Tammy Ferguson, acting warden here at Benner.

***
P.S., make this a priority, La. Don't play with me. I'm in no mood.

(N.T. at 22-23).

Det. Fure conducted a recorded interview with Zeno on July 31, 2014, along with Det. Sgt. Johnson. (N.T. at 101-103). Det. Fure testified with respect to a transcribed version of the recorded interview by reviewing and reading certain portions of the question and answer. (N.T. at 102-103). The interview revealed that Zeno had a telephone conversation with [Appellant] after receiving the letter outlining the kidnapping plot instructions during which [Appellant] told Zeno to forget the plan as "I got Lee. I got someone else to do it." (N.T. at 103). When questioned about the last time he had spoken to [Appellant], Zeno relayed to the Detectives that Appellant initially indicated that he did not want them to go through with the plot anymore but, as the conversation continued he directed Zeno "to call Lee and ask Lee if his is going to do it or not." (N.T. at 104). Det. Fure testified that, during the entire interview, Zeno never said the plan was just a joke. (N.T at 105).

Kenneth Lee Pailen[,] a former inmate who goes by the name Lee met [Appellant] when they were housed together at SCI-Benner Township. (N.T. at 42-43). They were initially on the same block and eventually became cellmates. (N.T. at 43). Pailen and [Appellant] engaged in an emotional and sexual relationship while incarcerated. (N.T. at 43).

Pailen was paroled from SCI-Benner Township on June 8, 2014. (N.T. at 44). Pailen testified that prior to his release, he and [Appellant] had had discussions about ways to get [Appellant] out of prison. (N.T. at 44-45). He said that [Appellant] discussed the idea of kidnapping MDJ Zozos. (N.T. at 45). More specifically, Pailen said that Appellant's plan was to kidnap and hold MDJ Zozos and his family captive so that they could be exchanged for his release. (N.T. at 46). Pailen said that the pair discussed the plan as late as 20 minutes before his release. (N.T. at 46).

Upon release, Pailen was living with his mother and grandmother at 4319 Avon Drive, Harrisburg, Pennsylvania. N.T. at 46. Pailen stated that during a July 8, 2014, phone call, [Appellant] told him that he would write him a letter expressing his love and providing instructions on what to do. (N.T. at 48-49; 52-53). The call was received at the number 545-3785 which Pailen verified was his land line telephone number at the 4319 Avon Drive location. (N.T. at 50-51). Pailen identified Appellant's voice on two July 8, 2014 recorded phone calls which were played for the jury. (N.T. at 49-53; Commw. Exh. – 1).

Pailen received a letter from Appellant postmarked July 9, 2014, which bore a return address from SCI-Benner Township. (N.T. at 48). Pailen read the five (5) page letter aloud for the jury. (N.T. at 54-59; Commw. Exh. – 3). A large portion of the beginning of the letter contained expression of [Appellant]' love for Pailen and his desire to have a relationship with him outside of prison. (N.T. at 54-56). Beginning on page three (3) of the letter, Appellant outlined in detail the kidnapping plan he was asking Pailen to carry out. The detailed instructions included the following:

> [I]f he has a wife, get her…trust me, stay positive and have faith.

\*\*\*

[I]f George Zozos has a wife, that's the target and who you need to get and you can get her while he's at work or luring her somewhere.

If he doesn't have a wife, he is the target. He is an MDJ so you know he works 8:00 A.M. to 4:00 P.M. Monday through Friday. So when he is at work, it's open opportunity to get his wife or wait until he comes home to get him.

\*\*\*

…altered appearance…you will need a disguise, gloves for no fingerprints, a high voltage taser gun to drop someone, duct tape for the mouth, two sets of handcuffs for the wrists and the other for the ankles, transportation, a safe house or spot to hold the hostage and a prepaid cell phone so the hostage can relay the demands.

If you get the wife, the demands are made to George Zozos. If you get him, the demands are made to his brother Dmitri Zozos, the bail bondsman.

\*\*\*

[M]ake sure they are secured with the handcuffs tight.

\*\*\*

[M]ake sure they don't have anything electronic on them that can be traced to the location where they will be kept.

Monday 7-14-14, that morning if it is the wife, I need you to get her. But if it is George Zozos, that afternoon or night.

Monday night, demands are made…tell whoever that is held hostage to relay the following message: That they are being held hostage a[t] gunpoint this very moment. This is their one and only call…[t]hey have until 10 A.M. Wednesday morning 7-16-14 to court order inmate Anthony Davis, state constable and yourself…pick him up an release him at the Friendly's

in Camp Hill, Pennsylvania no later than 10:00 a.m. Wednesday morning 7-16-14 and they won't die. No cops, no games, no dead body. Make sure they get that message and understand it.

\*\*\*

7-15-14 Tuesday morning my mom will call you. If you say chocolate chip cookies, that means everything is good. So between 8:00 A.M. and 9:00 A.M. be home and alter [sic] waiting for my call.

7-16-14, Wednesday, if all goes well, be in Arby's parking lot in a disguise with your car running with some money for us to last a few days.

Listen, you know what to do. Get it done….

(N.T. at 56-59). Pailen testified that he recognized the handwriting in the July 9, 2014, letter to be Appellant's. (N.T. at 59).

Pailen had been in telephone contact with Mr. Zeno 15 to 20 times. (N.T. at 60). According to Pailen, at no time by phone or in writing did [Appellant] tell him not to go through with his instructions. (N.T. at 60). However, he conceded on cross-examination that one time during a phone call [Appellant] said "I am not feeling this at all" without further explanation. (N.T. at 70). Pailen gave the July 9, 2014, letter to his parole officer and detectives investigating the case. (N.T. at 71).

Det. Sgt. Johnson interviewed Appellant on July 29, 2014, at SCI-Benner Township. (N.T. at 83). After ***Mirandizing***[ ] [Appellant], Johnson proceeded to question him about his relationship with Mr. Pailen. (N.T. at 83-84). Appellant confirmed he knew Pailen from SCI-Benner Township but denied that he was involved in any type of intimate relationship with him. (N.T. at 84). Instead, [Appellant] said that since Pailen was being released, he was using him "to get $50 on his books [meaning to have someone deposit money to an inmate personal account]" every week and send narcotics to the prison so he could make money selling them. (N.T. at 84).

When Det. Sgt. Johnson questioned Appellant about the plot to kidnap MDJ Zozos, he said that Pailen was responsible for the

idea. (N.T. at 84). When [Appellant] was shown the July 9, 2014, letter provided by Pailen, he responded by saying that Pailen sent the letter to him and he, along with some unknown person, rewrote it and sent it back. (N.T. at 84). [Appellant] refused to identify the person who purportedly helped him rewrite the letter. (N.T. at 84-85). Appellant also denied that the July 9, 2014, letter was written in his own handwriting. (N.T. at 84-85). Further, he completely denied knowing Mr. Zeno in any capacity. (N.T. at 85). [Appellant] kept telling the Detectives that a crime had not been committed but, if he were charged he would take responsibility and waive a preliminary hearing so he did not have to be housed in Dauphin County Prison. (N.T. at 85). Appellant insulted the Detectives by calling them "retarded" and claimed to have an attorney but would not supply the attorney's name. (N.T. at 85).

Trial Court Opinion, filed 12/18/15, at 1-9.

Appellant raises the following issues for our review:

> I. DID NOT THE LOWER COURT ABUSE ITS DISCRETION BY FAILING TO GRANT [APPELLANT] A NEW TRIAL ON THE BASIS THAT THE GUILTY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE WHEN THE TOTALITY OF THE EVIDENCE ON THE BASIC ISSUES OF THE CASE WAS SO INCONSISTENT AS TO BE IRRECONCILABLE?
>
> II. WAS A MANDATORY SENTENCE OF 10-20 YEARS, WHEN IMPOSED CONSECUTIVELY TO AN EXISTING SENTENCE OF 20 ½ - 41 YEARS, CLEARLY UNREASONABLE, SO MANIFESTLY EXCESSIVE AS TO CONSTITUTE AN ABUSE OF DISCRETION, AND INCONSISTENT WITH THE PROTECTION OF THE PUBLIC, THE GRAVITY OF THE OFFENSES, AND DEFENDANT'S REHABILITATIVE NEEDS?

Appellant's brief at 7.

Appellant contends that the trial court abused its discretion when it denied his post-sentence motion alleging that the verdict was against the

weight of the evidence. We apply the following standard of review to a challenge that a verdict is against the weight of the evidence:

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
>> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:
>
>> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted).

Renunciation as a defense to solicitation is set out in the Criminal Solicitation statute:

> It is a defense that the actor, after soliciting another person to commit a crime, persuaded him not to do so or otherwise prevented the commission of the crime, under circumstances manifesting a complete and voluntary renunciation of his criminal intent.

18 Pa.C.S.A. § 902(b). Appellant contends the Commonwealth failed in its obligation to disprove his renunciation defense, which consisted of Matthew Zeno's testimony that Appellant: angrily rebuked him over the phone on July 11, 2014, directing him to call Pailen and tell him "fuck him and fuck you"; did not contact either man for the next 9 days; and, when contacted by Zeno on July 20, 2014, and was asked if he still wished the kidnapping to take place replied "I don't know, I don't know, I don't know."

Appellant also posits that an apparent conflict in testimony regarding the July 20, 2014, phone conversation bears on the question of renunciation. Whereas Matthew Zeno admitted on cross-examination that it was he, and not Appellant, who broached the topic of whether to advance the kidnapping plot, Dauphin County Detective Peter Fure related a July 31, 2014, interview of Zeno in which Zeno first indicated Appellant no longer cared about the plot but then, at the end of the conversation, instructed Zeno to call Pailen and ask him if he was going to do it or not. For his part, Zeno testified that

- 10 -

he was not lying to Detective Fure when he characterized his July 20, 2014, telephone conversation with Appellant in this way.

After reviewing this record, the trial court concluded the Commonwealth carried its burden of disproving Appellant's defense of renunciation, opining "that a review of the evidence shows if there ever was an intent to renounce on the part of Appellant, which point is not conceded in any way, the renunciation was never complete and voluntary." Trial Court Opinion at 14. We discern no error in the court's exercise of discretion on this point, which was reasonably based on a record establishing, at best, Appellant's equivocation about executing his plan. Indeed, his expression of doubt about persisting in the plan was too vague—paling in comparison to his intense and highly specific directive to gain his release from prison—to constitute a renunciation of the plan.

To this end, we agree with the trial court's reasoning where it notes "importantly…, despite any purported inconsistencies in their [Zeno's and Pailen's] stories at various points in the investigation, each witness clearly testified that [Appellant] never said the plan was a joke and never said they should not go through with it." Trial Court Opinion at 15. Therefore, confronted with no evidence that Appellant persuaded Zeno and Pailen to desist from the plan or otherwise sought to prevent the commission of the crime, as required under Section 902(b), the trial court appropriately exercised its discretion in denying Appellant's weight of the evidence claim.

Appellant next challenges the court's decision to impose his mandatory 10 to 20 year sentence consecutively to a 20 ½ to 40 year prison sentence he is already serving. At 30 years old, and having already served 10 years of his existing sentence at the time he received sentence in the present case, Appellant will serve no less than 20 ½ years in prison under the current consecutively-run scheme and faces the possibility of serving a maximum of 50 years if both sentences run to their upper limits. This potentiality represents an abuse of discretion, Appellant maintains, as Appellant may not gain release until he reaches his eighties, making his sentence a *de facto* life sentence. Such a sentence is clearly unreasonable, particularly where the court "focused solely on the nature of the criminal conduct and the need to protect others," he asserts. Appellant's brief (Pa.R.A.P. 2119(f) Statement), at 22.

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." **Commonwealth v. Hoch**, 936 A.2d 515, 518 (Pa.Super. 2007) (citation omitted). To reach the merits of a discretionary issue, this Court must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

***Commonwealth v. Edwards***, 71 A.3d 323, 329–330 (Pa.Super. 2013) (citation omitted).

Appellant complied with the procedural requirements for this appeal by filing a timely post-sentence motion for modification of sentence, and subsequent notice of appeal, and by including in his appellate brief a statement of reasons relied upon for appeal pursuant to ***Commonwealth v. Tuladziecki***, 522 A.2d 17 (Pa. 1987), and Pa.R.A.P. 2119(f).  Therefore, we must determine whether Appellant raised a substantial question justifying our review.

A substantial question exists when an appellant sets forth "a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process." ***Commonwealth v. Ventura***, 975 A.2d 1128, 1133 (Pa.Super. 2009).  Although a challenge to the court's discretion to impose a consecutive sentence ordinarily does not raise a substantial question, ***Commonwealth v. Johnson***, 873 A.2d 704, 709 n. 2 (Pa.Super. 2005), we held in ***Commonwealth v. Marts***, 889 A.2d 608 (Pa.Super. 2005), that this issue must be examined on a case-by-case basis.  In ***Commonwealth v. Gonzalez–Dejusus***, 994 A.2d 595, 599 (Pa.Super. 2010), this Court stated that the key to determining whether a consecutive sentencing scheme presents a substantial question is "whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at

issue in the case." *Accord Commonwealth v. Moury*, 992 A.2d 162, 171–172 (Pa.Super. 2010) (holding such a claim may be addressed when the defendant alleges the "aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment."). Therefore, because we find Appellant's claim nominally raises a substantial question, we proceed to an examination of his argument on appeal.

When considering a challenge to the discretionary aspects of sentencing we must bear in mind the following:

> Sentencing is a matter vested in the sound discretion of the judge, and will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Sheller*, 961 A.2d 187, 190 (Pa.Super. 2008) (citation omitted).

We find no evidence in the record that the sentencing court "ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." *Commonwealth v. Disalvo*, 70 A.3d 900, 903 (Pa.Super. 2013). The court imposed sentence at the conclusion of a sentencing hearing in which the only issue to decide was whether the sentence would run concurrently or consecutively. Defense counsel apprised the court of Appellant's positive achievements during his 10-year prison stay, including his satisfactory

performance of work details, completion of "some programming," tutoring students working toward their GEDs, and incurring no "write-ups" for violent behavior. N.T. 6/25/15 at 18-19. Counsel also presented the argument that a consecutive sentence could conceivably keep Appellant in prison until his eighties. N.T. at 19-20.

Under the record before the trial court, the fact that Appellant's sentence was run consecutively does not render it excessive or unreasonable, and we, thus, discern no abuse of discretion in the sentence imposed. *See Commonwealth v. Bowen*, 55 A.3d 1254, 1265 (Pa.Super. 2012) (holding trial court determines whether a sentence should run consecutive to or concurrent with another sentence). The court articulated clearly that both the seriousness of the present offense and Appellant's violent history tracing back to his juvenile years—comprising ten prior first-degree felony offenses, two second-degree felonies, and two third-degree felonies—necessitated a consecutive sentence for the protection of the public.

Moreover, the failure of rehabilitative efforts during Appellant's ten years' incarceration is manifest from his attempt to solicit others to commit the same violent, terrifying crime for which he was already imprisoned, the court opined. Appellant knew from the victim testimony given at his prior criminal trial of the horrifying experience endured by his victims—a family of three including a 12 year-old boy—during a home invasion and kidnapping at gunpoint. N.T. at 8-15, 21-23. Appellant demonstrated a blatant disregard

for both the terrible physical and emotional pain endured by his previous victims and the same fate his intended victims would suffer had Zeno and Pailen carried out his orders in the present case.

Appellant's long, violent history coupled with his continued disregard for the misery his crimes have caused in the past and would have imminently caused in the present case clearly supports the consecutive sentence meted out below. As such, the case *sub judice* is distinguishable from **Commonwealth v. Dodge**, 859 A.2d 771 (Pa.Super. 2004) , where we found a claim that consecutive standard range sentences on thirty-seven counts of non-violent, theft-related offenses for an aggregate sentence of 58 1/2 to 124 years of imprisonment was excessive. Accordingly, we perceive no abuse of sentencing discretion in imposing the present sentence consecutively to the sentence Appellant currently serves.

Judgment of sentence is affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/6/2016

- 16 -